UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

THERESA CAMPOS,

        Plaintiff,

v.

IMAGINE COMMUNICATIONS CORP.,

        Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff, Theresa Campos, by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint & Jury Demand against Imagine Communications Corp. ("Defendant" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's failure to accommodate, discrimination toward and wrongful termination of Plaintiff because she suffers from multiple sclerosis, an actual and/or perceived disability within the meaning of the Americans with Disabilities Act ("ADA"). Defendant repeatedly failed to reasonably accommodate Plaintiff and failed to engage in an interactive process with even the modest accommodation request that Plaintiff be moved closer to the bathroom to manage her symptoms. Defendant then imposed manufactured discipline against Plaintiff for her medically-related absences, telling her that the write-up would go away if she could provide a doctor's note for absences from as long ago as six

months prior.

2. Defendant told Plaintiff that she would be terminated for any additional absences related to her medical condition while Plaintiff was undergoing a medication adjustment causing her headaches with increasing severity. Plaintiff accordingly was forced to go on leave under the Family & Medical Leave Act ("FMLA") on June 1, 2017. Plaintiff kept in contact with the Company during her leave and reiterated her requested accommodations for her expected return to work, which Plaintiff told the Company would likely be after her next appointment with her neurologist on September 22, 2017. However, Defendant terminated Plaintiff "because there's no longer protection for your position," effective September 13, 2017, telling her that her FMLA leave had been exhausted on August 18, 2017. Defendant thereby terminated Plaintiff approximately 9 days before she would have been released to return to work because of her actual and/or perceived disability and/or in retaliation for requesting accommodation of her actual and/or perceived disability and taking leave under the FMLA.

## PARTIES

3. At all times relevant to this Complaint, Plaintiff was and is a resident of Colorado.

4. Defendant Imagine Communications Corp. is a Delaware corporation with a principal office located at 101 W Colfax Avenue, Suite 600, Denver, Colorado 80202.

5. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

## JURISDICTION AND VENUE

6. Plaintiff incorporates by reference the above paragraphs as though set forth

separately and fully herein.

7. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and based on diversity of citizenship under 28 U.S.C. § 1332.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

9. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

10. Plaintiff filed her Charge of Discrimination Number 32A-2018-00241 and FE2018789267 with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, for disability discrimination and retaliation on February 1, 2018. Plaintiff was issued a Notice of Right to Sue with respect to the above Charge Numbers and Plaintiff has filed the present action within ninety (90) days of receipt of same.

11. Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

12. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

13. Plaintiff is an individual with a disability, multiple sclerosis, which, without ameliorative devices such as her walker and her cane, substantially limits her ability to walk, bowel and bladder control, and lifting.

14. Plaintiff began working for Defendant in 2014 as a Senior Support Engineer, when

her previous employer, whom Plaintiff had worked for since 2007, merged with Defendant.

15. Throughout her employment with the Company, Plaintiff met or exceeded all of Defendant's legitimate performance expectations.

16. In approximately 2014, Plaintiff was diagnosed with multiple sclerosis and Plaintiff informed Defendant of her diagnosis thereafter.

17. In or around January 2017, Plaintiff began experiencing targeted, less favorable treatment from one of Defendant's managers, Dan Hakes.

18. For example, though Plaintiff had been working from home approximately three days a week, Mr. Hakes, without any effort to engage in an interactive process, suddenly told Plaintiff that there would be no accommodation provided to allow Plaintiff to work from home, and that she needed to be in the office every single day. Mr. Hakes threatened, "We're not giving you any allowances."

19. Upon information and belief, similarly situated, non-disabled employees of Defendant's were routinely allowed to work from home as needed; sometimes even as much as two to three days out of each week.

20. Shortly after January 2017, Plaintiff was given a new supervisor, Eric Meredith. Mr. Hakes was promoted and became Mr. Meredith's direct supervisor.

21. Mr. Meredith was initially understanding about Plaintiff's medical condition. For example, Mr. Meredith told Plaintiff that he had a friend with multiple sclerosis who also needed to work from home when she experienced a flare up of symptoms related to her condition.

22. However, in or around April 2017, Plaintiff was called into a meeting with Mr. Meredith. He explained that he needed to set up something with human resources about Plaintiff

working from home. Mr. Meredith said that his supervisor, Mr. Hakes, wanted him to make sure that they were following the Company's policies with respect to Plaintiff and that Mr. Hakes wanted him "to look into this, because we don't want people working from home."

23. Mr. Meredith then asked that Plaintiff obtain a note from her doctor asking, again, for the reasonable accommodation of working from home as needed due to her medical condition.

24. Plaintiff told Mr. Meredith that she would obtain the requested doctor's note. Plaintiff also noted to Mr. Meredith that the Company allowed other employees to work from home routinely without requiring a doctor's note.

25. Plaintiff obtained a doctor's note requesting the reasonable accommodation of being allowed to work from home and provided same to the Company.

26. On or about April 20, 2017, Plaintiff was asked to attend another meeting with Mr. Meredith and one of the Company's human resources representatives, Tracy Townsley.

27. Prior to this meeting, Plaintiff had sent Ms. Townsley an email asking what the Company's policy was regarding employees working from home since the Company had employees that worked remotely all the time, as well as employees that did so routinely.

28. In the April 20, 2017 meeting, Ms. Townsley addressed Plaintiff's email, explaining that the Company generally liked employees to work from the office if it is in the vicinity, but that there were no written policies on the issue. Ms. Townsley also explained to Mr. Meredith that, as long as Plaintiff was doing her job, there would not be a problem with her working from home while managing her multiple sclerosis.

29. In the April 20, 2017 meeting, Mr. Meredith confirmed that Plaintiff was doing her job satisfactorily and that she had met all her performance metrics in the past.

30. A few weeks later, on or about May 11, 2017, Plaintiff had her annual performance review with Plaintiff.

31. Mr. Meredith gave Plaintiff a favorable performance review.

32. However, Mr. Meredith told Plaintiff that he "wanted to loosely touch base" on Plaintiff's attendance because he stated that he was "talking to everyone on our team about absences." Mr. Meredith told Plaintiff he wanted to make sure she "didn't get on HR's radar, since she has a medical condition."

33. Approximately two weeks later, on or about May 24, 2017, Plaintiff received an email asking that she attend another meeting with Mr. Meredith and human resources to talk about her attendance.

34. At the meeting, Plaintiff was told that she was being written up for excessive attendance issues. Mr. Meredith told Plaintiff that she had been out sick 12 days since January. Though Plaintiff had already spoken to Mr. Meredith about this issue, she again explained that multiple sclerosis was an unpredictable condition but that she had always provided the most advance notice possible and made sure to make up any work missed because of her medical condition.

35. Plaintiff, remembering Mr. Meredith's remark during her performance review about "getting on HR's radar," asked Ms. Townsley when she had "managed to get on HR's radar?" Ms. Townsley asked Plaintiff what she meant by her question, and Plaintiff related the discussion she had with Mr. Meredith during her performance review. Ms. Townsley then explained that there was no Company policy allowing only a specific number of absences, such as 11 or 12 absences during a six-month period. Ms. Townsley told Plaintiff, "This is all Eric

[Meredith], this is not HR." She said that the Company's human resources left it up to the managers to decide if they felt like an employee's absences were an issue.

36. Mr. Meredith then told Plaintiff for the first time that he felt that her absences were affecting her performance. Mr. Meredith told Plaintiff that any further absences – even those caused by Plaintiff's multiple sclerosis – could cause Plaintiff to be written up again or even her immediate termination. Mr. Meredith then reiterated, "And I want to stress that it would be immediate termination."

37. Mr. Meredith then claimed that Plaintiff's absences were causing manufactured performance issues that had coincidentally not existed at the time of Plaintiff's performance review on May 11, 2017. Mr. Meredith started saying, "We talked about your performance on April 20, 2017 …" Plaintiff had to correct Mr. Meredith, reminding him that the April 20, 2017 meeting had been solely about Plaintiff working from home, and that Mr. Meredith had specifically said on that day that her performance had always been satisfactory. Mr. Meredith then told Plaintiff that her absences were affecting her team's performance. Plaintiff asked why other team members' absences were not similarly considered team-based performance issues, and Mr. Meredith responded, "We're just talking about you right now."

38. Mr. Meredith told Plaintiff that her write-up would go away if every single absence she had taken due to her medical condition was accounted for by a doctor's note.

39. Plaintiff was given no advance notice of this new rule for her sick days that had occurred nearly six months prior to the requirement being imposed by Defendant.

40. Plaintiff explained that she does not go to the doctor every time she experiences a flare-up of symptoms, and that she had already provided the Company with a note that she would

need occasional days off work to continue to manage her condition. Rather than simply requiring a doctor's note substantiating Plaintiff's need for occasional leave, the Company instead imposed the impossible requirement that Plaintiff must justify every flare up by going to the doctor any day she experienced a flare up of symptoms in order to avoid the Company's manufactured discipline.

41.     At the time Defendant imposed its manufactured discipline and thereafter, Plaintiff was suffering from headaches of increasing severity due to a medication change that sometimes caused her blood pressure to skyrocket. The stress of the Company's failure to accommodate Plaintiff, combined with the retaliatory discipline she was receiving, exacerbated Plaintiff's symptoms.

42.     Defendant additionally failed to engage in a good faith interactive process and failed to accommodate Plaintiff by outright denying her reasonable request that she be moved closer to the restroom to help manage her bowel and bladder control symptoms.

43.     Defendant denied Plaintiff's request to be moved closer to the bathroom, without offering any alternative suggestions, because it purportedly wanted the team to be close together to collaborate.

44.     In late May 2017, Plaintiff's doctor advised that she should go on short-term disability and leave under the Family & Medical Leave Act ("FMLA") because her medication adjustment would cause ongoing symptoms that would temporarily interfere with her ability to go to work.

45.     Plaintiff's leave under the FMLA began June 1, 2017.

46.     On June 19, 2017, Plaintiff received a call from Mr. Meredith asking about her status. Plaintiff told him that she was going to the doctor on June 21, 2017, and that she expected

Case 1:19-cv-00203-STV   Document 1   Filed 01/23/19   USDC Colorado   Page 9 of 16

to know when she would be able to return to work after that appointment. Mr. Meredith then told Plaintiff that she had been denied short-term disability benefits and, since she was denied, her job would not be protected, and she would not have an excuse for missing work. Mr. Meredith told Plaintiff that she had to return to work the first day after her short-term disability benefits were denied, or she would be terminated.

47. Plaintiff, confused, told Mr. Meredith that she believed her doctor had until June 22, 2017 to submit information related to her claim for short-term disability benefits. She also explained that she had spoken with the Company's short-term disability benefits provider, Cigna, the week prior and had not received any notice that her benefits had been denied. Mr. Meredith told Plaintiff that the Company had some conflicting information. He instructed Plaintiff to confirm the status of her claim with Cigna again and then reach out to Mr. Hakes directly to let him know the status.

48. Plaintiff did as Mr. Meredith instructed and reached out to Mr. Hakes after confirming her short-term disability benefits had not been denied. Mr. Hakes immediately began demanding that Plaintiff confirm that she would be back in the office the next day.

49. Plaintiff explained that she had spoken with Cigna, and that her claim for short-term disability benefits had not been denied. Mr. Hakes argued that he had a paper in front of him stating that Plaintiff's short-term disability benefits had been denied, that she did not have a medical reason to be out, and that she needed to be back in the office the next day.

50. Plaintiff asked Mr. Hakes if there was a date on the document he was referencing. Mr. Hakes did not respond, and Plaintiff offered that her most-recent information was dated June 17, 2017. Plaintiff never heard back concerning what information or documents Mr. Hakes had

been referring to in order to try to justify his demands that Plaintiff return to work from medically-necessary leave without being released to do so.

51. Plaintiff continued to make every effort to return to work as soon as possible while she adjusted to her new medication regimen and kept Defendant apprised of her status and expected to return to work in September 2017.

52. For instance, Plaintiff kept in contact with Plaintiff's human resources employee, Natasha Alexander. Plaintiff also informed Ms. Alexander of the requested accommodations she would need when she returned to work. Plaintiff and Ms. Alexander discussed Plaintiff's previously-requested accommodations of being moved closer to the restroom and being allowed to work from home when needed. Ms. Alexander seemed optimistic that both accommodations would be approved. Plaintiff also told Ms. Alexander that her next appointment with her neurologist would be September 22, 2017, and that she was expected to be released to return to work at that time.

53. On September 12, 2017, Mr. Meredith sent Plaintiff an email asking if they could chat. Plaintiff replied yes and was sent a meeting confirmation from Ms. Townsley and Mr. Hakes. In the call, Plaintiff was informed that her FMLA leave had expired on August 18 and, "because there's no longer protection for your position," the Company was terminating her effective September 13, 2017, only nine days before Plaintiff had informed the Company that she was expected to be released to return to work.

54. Plaintiff was released to return to work at her September 22, 2017 appointment with her neurologist. However, because Plaintiff had already been terminated and was unemployed at the time, Plaintiff decided to undergo knee replacement surgery. Due to her surgery, Plaintiff

continued to receive short-term disability benefits until approximately November 2017. Had Defendant not terminated Plaintiff's employment, Plaintiff would have been able to return to work after being released on September 22, 2017, and Plaintiff would have postponed her knee replacement surgery until the Company authorized leave to undergo same.

## FIRST CLAIM FOR RELIEF
### (Disability Discrimination and Failure to Accommodate in Violation of Section 102(a) and (b)(5)(A) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and (b)(5)(A))

55. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

56. Plaintiff is a disabled person within the meaning of the ADA.

57. Plaintiff suffers from multiple sclerosis, which, without ameliorative devices such as her walker and her cane, substantially limits her ability to walk, bowel and bladder control, and lifting as compared to the general population. Plaintiff's multiple sclerosis further substantially limits the operation of one or more major bodily functions (i.e., Plaintiff's bowel, bladder, and neurological functions).

58. Though Plaintiff suffered from a disabling medical condition at the time of her termination, Plaintiff was qualified for her job and capable of performing the essential functions of her position with reasonable accommodations.

59. At the time of Plaintiff's termination, Plaintiff was also regarded as being disabled by Defendant.

60. Since at least January 2017, if not earlier, Defendant discriminated against Plaintiff because of her disability by denying Plaintiff reasonable accommodation and failing to engage in an interactive process calculated to develop a reasonable accommodation for Plaintiff. Such

reasonable accommodation would have permitted Plaintiff to perform the essential functions of her position and would not have caused any undue hardship on Defendant.

61. For instance, Plaintiff requested the accommodation of being moved closer to the bathroom because of her disabling medical condition.

62. Defendant denied Plaintiff's request to be moved closer to the bathroom.

63. Allowing Plaintiff to move closer to the bathroom would not have caused an undue hardship on Defendant.

64. Similarly, Plaintiff requested the accommodation of being allowed to work from home to manage any flare up of symptoms related to her disabling medical condition.

65. Defendant denied Plaintiff's request of being allowed to work from home as needed.

66. Allowing Plaintiff to work from home as needed to manage flare ups related to her medical condition would not have caused an undue hardship on Defendant.

67. Plaintiff requested the accommodation of leave from work for a definite duration to deal with symptoms associated with a medication change for her disabling medical condition.

68. Defendant effectively denied Plaintiff's request of leave from work for a definite duration by terminating her employment approximately 9 days before she was released to return to work.

69. Allowing Plaintiff leave from work related to her medical condition until September 22, 2017 would not have caused an undue hardship on Defendant.

70. On or about May 11, 2017, Defendant further discriminated against Plaintiff because of her actual and/or perceived disability by subjecting her to less favorably terms,

conditions and privileges of employment, imposing manufactured discipline for absences related to her medical condition, requiring Plaintiff to obtain doctor's notes to excuse absences from as much as six months prior, subjecting Plaintiff to heightened performance standards, and terminating Plaintiff's employment, in violation of the ADA.

71. The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her actual and/or perceived disability, and/or Defendant's denial of Plaintiff's requests for reasonable accommodation of her actual and/or perceived disability.

72. Defendant's above-described conduct was intentional.

73. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally-protected rights.

74. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
**(Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))**

75. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

76. Since at least January 2017, if not earlier, Plaintiff made requests for reasonable accommodations related to her actual and/or perceived disability.

77. For instance, Plaintiff requested multiple times the reasonable accommodation of being allowed to work from home as needed to manage flare ups related to her medical condition.

Plaintiff also requested multiple times that she be moved closer to the bathroom to manage symptoms related to her medical condition. Plaintiff also requested multiple periods of leave from work for a definite duration to manage symptoms from a medication change related to her medical condition. In making these requests, Plaintiff was engaging in activity protected under the ADA.

78. Defendant retaliated against Plaintiff after she engaged in the above-described protected activity.

79. Plaintiff used accommodations related to her disabling medical condition during her employment with Defendant. For example, Plaintiff provided a doctor's note requesting that she permitted to be absent from work when she experienced a flare-up of symptoms; which Defendant permitted, until Plaintiff was disciplined for having taken such absences and asked to provide individual doctor's notes excusing each prior absence, though other employees were not so required. Plaintiff also worked from home approximately three days each week to manage her symptom flare-ups; which Defendant permitted, until Plaintiff was reprimanded from working from home when other employees were permitted to work from home without negative consequence. Plaintiff also went on leave for a medication adjustment beginning June 1, 2017, and Plaintiff requested and used additional periods of leave related to her medication adjustment until she was expected to be released to return to work on September 22, 2017; which Defendant permitted, until it terminated Plaintiff for being on leave from work effective September 13, 2017. In engaging in the above-described activities, Plaintiff was engaging in activity protected by the ADA.

80. Defendant retaliated against Plaintiff after she engaged in the above-described protected activity.

81. More specifically, Plaintiff suffered one or more materially adverse job consequences intentionally imposed by Defendant, including: imposing manufactured discipline against Plaintiff for absences related to her medical condition, and terminating Plaintiff's employment. These consequences are of the type that would tend to discourage similarly situated employees from requesting accommodations related to a protected medical condition.

82. A causal connection exists between Plaintiff's protected activities and Defendant's materially adverse actions, i.e., Defendant disciplined Plaintiff and terminated her employment because she used and/or requested reasonable accommodations related to her disabling medical condition.

83. Defendant's above-described conduct was intentional.

84. Defendant's above-described conduct was done with malice or with reckless indifference to Plaintiff's federally-protected rights.

85. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and she is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B.     Punitive damages for all claims as allowed by law;

C.     Attorneys' fees and costs of this action;

D.     Pre-judgment and post-judgment interest at the highest lawful rate; and

E.     Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 29th day of January 2019.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Shelby Woods*
Claire E. Hunter (39504)
Shelby Woods (48606)
HKM Employment Attorneys LLP
730 17th Street, Suite 750
Denver, Colorado 80202
chunter@hkm.com
swoods@hkm.com
*Attorneys for Plaintiff Theresa Campos*